NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10667

COMMONWEALTH  vs.  KENJI DRAYTON.


Suffolk.     February 8, 2018. - May 9, 2018.

Present:  Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Homicide.  Firearms.  Evidence, Hearsay, Declaration of deceased
     person.  Practice, Criminal, Capital case, New trial,
     Affidavit.



     Indictments found and returned in the Superior Court
Department on December 11, 2001.

     Following review by this court, 473 Mass. 23 (2015), a
motion for a new trial was heard by Mitchell H. Kaplan, J.


     Teresa K. Anderson, Assistant District Attorney, for the
Commonwealth.
     Cathryn A. Neaves for the defendant.


     KAFKER, J.  A Superior Court jury convicted the defendant

of murder in the first degree for the killing of Michael Greene

and of unlawful possession of a firearm.  The Commonwealth's

case against the defendant at trial largely depended on the

testimony of a single percipient witness, James Jackson.

Approximately eighteen months after the convictions, another individual, Debra Bell, came forward and stated in an affidavit that Jackson could not have witnessed the shooting because she was in the bathroom with Jackson at the time that it occurred.[1] The affiant died shortly after providing the affidavit. The defendant moved for a new trial on the basis that this affidavit was newly discovered evidence, but the trial judge denied the motion.

In Commonwealth v. Drayton, 473 Mass. 23 (2015) (Drayton I), we rejected the defendant's claims of error at trial and declined to grant the defendant relief under G. L. c. 278, § 33E. We did, however, remand the case for an evidentiary hearing on the defendant's motion for a new trial to determine whether "Debra's affidavit falls within a narrow, constitutionally based exception to the hearsay rule, which applies where otherwise inadmissible hearsay is critical to the defense and bears persuasive guarantees of trustworthiness." Drayton I, supra at 25. On remand, a different judge determined that Debra's affidavit fell within the exception and granted the defendant's motion for a new trial. The Commonwealth appealed.

---

[1] Because Debra Bell shares a last name with her sister who is also discussed, Betty Jo Bell, we refer to both by their first names.

We discern no error or abuse of discretion by the motion judge in allowing the defendant's motion for a new trial. In so concluding, we give deference to the motion judge's credibility findings and conduct our own independent review of the documentary evidence and constitutional issues. The affidavit is admissible because it would have been critical to the defense and it bears "persuasive assurances of trustworthiness." Drayton I, 473 Mass. at 36, quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973). Furthermore, the affidavit is newly discovered evidence and casts real doubt on the justice of the defendant's convictions. We therefore affirm the decision of the motion judge granting the defendant's motion for a new trial.

1. Background. Drayton I presented the facts underlying the defendant's convictions. See Drayton I, 473 Mass. at 25-29. We focus here on the specific facts relevant to the issues in this appeal.

a. The shooting. The Commonwealth's evidence against the defendant centered on the testimony of Jackson, the man who lived in the apartment where Greene was killed. Drayton I, 473 Mass. at 26. Jackson testified that he let Greene use his apartment to sell drugs in exchange for money and free drugs. Id. at 25. Jackson had a similar arrangement in the same apartment with the defendant and his codefendant, Levino

Williams.[2]  Id.  One week before the shooting, Jackson told Greene that he could no longer use the apartment to sell drugs. Id.

On the day of the shooting, the defendant and Williams were in the apartment with Jackson, drinking and rolling "oolies," which are "cigarettes laced with cocaine and 'reefer.'"  Id. Debra and her sister, Betty Jo Bell, were also at the apartment during the day, although Jackson testified that both Debra and Betty Jo left at some point prior to the shooting.[3]

Jackson testified that, at some point, he let Greene into the apartment.  According to Jackson's testimony, when he let Greene into the apartment, it was just Greene, the defendant, Williams, and Jackson still in the apartment, with the defendant in the living room with Jackson and Williams seated nearby at the kitchen table.  Jackson then told Greene that he did not want Greene to sell drugs in the apartment anymore, which upset Greene.  Id.  According to Jackson, Greene then made a cellular telephone call during which he threatened to "kill 'em all" and burn down the apartment.  Id.  After Greene made this

---

[2] Levino Williams, the codefendant at trial, was acquitted.

[3] According to James Jackson's testimony, there may have been several other people in the apartment throughout the day. Jackson testified that two tall white males, one named Mark and another whose name is unknown, were in the apartment during the day.  Statements made to the police also place a woman named Sandra in the apartment at various times.

threatening telephone call, Jackson left the living room to go to the bathroom.  Id.  Jackson heard a gunshot as he was preparing to leave the bathroom.  Id.  He walked out and saw the defendant shoot Greene five additional times.  Id. at 25-26.

The Commonwealth offered very little physical evidence beyond Jackson's testimony that linked the defendant to the shooting:  the Commonwealth never located the firearm used to shoot Greene, and the only physical evidence that linked the defendant to the apartment were a beer bottle that contained a latent finger print matching the defendant's right middle finger joint and a cellular telephone linked to a person known to both the defendant and Williams.[4]  Id. at 27.

Furthermore, as we noted in Drayton I, "[t]he problems with Jackson's credibility were legion."  Id. at 26.  Jackson was a heavy drinker and used drugs, including "crack" cocaine, extensively throughout his life and in the days leading up to the shooting.  Id.  His testimony at trial contradicted some of his earlier statements, including his 911 call and his grand jury testimony.  Id.  For example, in his 911 call, Jackson stated that an unknown assailant pushed through the door and shot Greene.  Id.  Jackson also testified during his grand jury

---

[4] The police traced the cellular telephone to an address in the Dorchester section of Boston and a woman named Tamika Ivy. The parties stipulated at trial that both the defendant and Williams knew Ivy.

testimony that Williams was standing behind the defendant as the defendant shot Greene but testified at trial that he did not see Williams when he saw the defendant shoot Greene. Id. Defense counsel attempted to impeach him with many of these inconsistencies. Id. Jackson even stated during his testimony that parts of his previous statements were either untrue or mistaken. Id. Despite these limitations and the "other inconsistencies and seeming obfuscations" in Jackson's testimony, the defendant was convicted of murder in the first degree for the shooting of Greene based largely on Jackson's testimony. Id.

    b. Postconviction affidavits. In October, 2006, eighteen months after the convictions, Debra contacted attorney Bernard Grossberg, the defendant's trial counsel. Drayton I, 473 Mass. at 24. In a signed affidavit dated October 17, 2006, Debra stated that she was diagnosed with metastatic cancer and was undergoing chemotherapy. She stated that "[b]ecause of the uncertainty of [her] medical condition," she did not want the fact that she did not disclose what she knew about the shooting of Greene on her conscience and decided to come forward. She also stated that her initial statement to police on September 27, 2001, was "not completely truthful," that she only said those things "in order to get out of there as quickly as

possible," and that "[t]he officers asked [her] questions, to which [she] agreed in order to be able to leave."[5]

In the affidavit, Debra described the afternoon of the shooting very differently from what was presented by Jackson's testimony. She stated that she arrived at the apartment that morning at approximately 11 A.M. but left after an argument with Jackson. She stated that she then returned to the apartment "a little after 3:00 P.M." and that "there were a number of people in the apartment," including Jackson, Greene, a black woman named Sandra, an unknown white male, and a black male named Joe. According to the affidavit, Debra then brought Jackson into the bathroom, where they "were smoking crack cocaine and engaged in sexual acts."[6] At some point, Debra heard "a series of noises" and asked Jackson "if he heard the noises and he said he was not sure of what or if he heard anything." After she waited a few

---

[5] In her initial statement, Debra told the police that she left the apartment before the shooting and did not mention anything about being in the bathroom with Jackson. In her affidavit, Debra stated that at the time of her original statement to police she was "afraid of the officers," she "did not want to get involved in the case," and "the officers told [her] that they would take care of arrest warrants that were pending against [her] in different courts."

[6] In the affidavit, Debra stated that she had known Jackson "for about three years" and that she "had an off and on intimate relationship" with him. In her statement to police on September 27, 2001, Debra described her relationship with Jackson as "like a brother/sister friendship, concerned about no other guy." At trial, Jackson testified on cross-examination that he had not been involved in a relationship with Debra.

minutes, Debra "opened the bathroom door and briefly peeked out
the door." She saw a person's legs on the floor and "screamed
to Jackson to look out the door." Jackson replied, "'[h]ell
with it' or words to that effect," and slammed the door, saying
that "he did not care about what was going on." After a short
time, Debra opened the door and fled the apartment. Her
affidavit concluded with the statement that "there was
absolutely no way that either [Jackson] or I . . . could have
seen who shot Michael Greene or who was in the apartment at that
time."

Grossberg obtained several additional affidavits, including
one from Betty Jo. In her affidavit, Betty Jo stated that she
arrived at the apartment on the day of the shooting at
approximately 11 A.M. and left approximately one hour later,
returning at some point in the afternoon to find the building
sealed off by the police.[7] She stated that while she was there,
the only other people in the apartment were "Jackson, Sandra,
Mike, Joe, and Debra." Betty Jo then stated that, "[e]very now
and then after the shooting on September 20, 2001, [her] sister,
Debra Bell[,] would tell [her] about what had occurred in the
apartment" and "would say that she and . . . Jackson were in the

---

[7] Betty Jo died in February, 2016, which was after the
release of our decision in Drayton I but prior to the
evidentiary hearing. See Commonwealth v. Drayton, 473 Mass. 23
(2015) (Drayton I) (decided October 1, 2015).

bathroom getting high on crack cocaine and engaging in sexual activity when the shooting occurred." Betty Jo also stated that Debra "would tell [Betty Jo] this more often as she became more ill" and that "she wanted the truth to be known" and to "clear her conscience." According to the affidavit, just before she died, Debra made Betty Jo promise that Betty Jo would "take care of her children and that [Betty Jo] would make the truth known about the shooting in . . . Jackson's apartment."

The other two affidavits were from a man identified as Joseph Anderson. In his first affidavit, dated May 15, 2007, Anderson stated that he went to the apartment on the day of the shooting to purchase crack cocaine from Jackson for a friend. Anderson stated that Jackson handed him a small packet of crack cocaine and that as Anderson turned to leave, he "saw . . . Jackson going into the bathroom with a black woman, who was known to [him] as Debra Bell." In a second affidavit, dated July 5, 2007, Anderson added that as he was leaving the apartment, he passed two men arguing in the hallway. He then stated that "[b]efore [he] got to the corner, [he] heard what sounded like gun shots coming from the area of the apartment."

c. Procedural history. While his direct appeal was pending, the defendant filed a motion for a new trial in December, 2006, alleging that Debra's affidavit was newly

discovered evidence that warranted a new trial.[8]  Following a nonevidentiary hearing, the trial judge denied the motion in November, 2007.  Although the judge stated that she had considered holding an evidentiary hearing, she decided not to do so because the evidence was inadmissible and impeachment evidence alone is ordinarily insufficient to obtain a new trial. She accordingly denied the motion on these grounds. Specifically, the judge concluded that the affidavit was inadmissible because it did not meet the requirements of the dying declaration exception.  Because the judge determined that the affidavit was inadmissible, she did not reach the other issues raised by the defendant's motion for a new trial.  The defendant filed a second motion for a new trial in April, 2012, this time alleging ineffective assistance of counsel due to the failure to engage a sleep deprivation or drug use expert and a violation of his right to a public trial because of the exclusion of the defendant's mother and friend.  The judge denied this motion in August, 2012.

This court then heard the defendant's consolidated appeal from the convictions of murder in the first degree and unlawful possession of a firearm, and from the denial of the defendant's

---

[8] Debra died on December 19, 2006, a week after the defendant filed his first motion for a new trial.  The defendant later filed the affidavits of Betty Jo and Anderson in support of the first motion for a new trial.

motions for a new trial.  See Drayton I, 473 Mass. at 24-25.  We rejected the claims of error at trial that the defendant asserted, both on direct appeal and in his second motion for a new trial, and declined to grant the defendant relief under G. L. c. 278, § 33E.  Id.  With regard to the defendant's first motion for a new trial based on newly discovered evidence, however, we concluded that, under the unusual circumstances of this case, there was a substantial issue whether Debra's affidavit falls within a narrow, constitutionally based exception to the hearsay rule, which applies where otherwise inadmissible hearsay is critical to the defense and bears persuasive guarantees of trustworthiness.  Id. at 40.  We therefore remanded the matter for an evidentiary hearing on that issue.  See id. at 25.

On remand, a different judge in the Superior Court conducted the evidentiary hearing.[9]  At the hearing, the only witness who testified was Grossberg.  Grossberg testified that he tried to locate Debra prior to trial and hired an investigator to find her but was unsuccessful.  Grossberg then testified that Debra contacted him "out of the blue" in October, 2006.  When she came to his office, she "looked very sickly and was wearing a scarf to cover her head."  She told Grossberg that she knew she was dying.  A few months later, Betty Jo contacted

---

[9] The case was heard by a different judge on remand because the original trial judge had retired.

Grossberg and informed him that Debra had died.  Betty Jo spoke with Grossberg at his office and signed her affidavit.  Anderson also met with Grossberg at his office and signed his two affidavits.[10]

The motion judge concluded that Debra's affidavit was admissible because it met the test articulated by this court in Drayton I, 473 Mass. at 36.  Specifically, the judge found that Debra was motivated to come forward by "her certain impending death and her desire to clear her conscience" and that "no evidence of any other motivating circumstance was presented." The Commonwealth did not produce "any evidence that Debra had any prior relationship to the defendant . . . that might have motivated her actions."  The judge also found that the other affidavits "provide[d] credible corroboration for Debra's statements, further demonstrating the statements' trustworthiness."  The judge credited Grossberg's testimony on the circumstances surrounding the affidavits from Betty Jo and Anderson, finding that "the affidavits, particularly Betty Jo's, [were] properly viewed as credible."  In concluding that Debra's affidavit was trustworthy, the judge noted that there was "no

_____

[10] The motion judge noted that it was not clear how Joseph Anderson had come to attorney Bernard Grossberg's attention but credited Grossberg's testimony regarding the statements in the affidavits.  Grossberg testified that he did not know about Anderson until Debra mentioned him in her affidavit.

evidence calling into question the authenticity of these affidavits or the veracity of their content." The judge also concluded that the affidavit was newly discovered evidence as Debra was unavailable and, given Betty Jo's prior statements, Grossberg had no reasonable expectation that she had any exculpatory information. As the affidavits were newly discovered and cast real doubt on the justice of the defendant's convictions, the judge therefore granted the defendant's motion for a new trial.

2. Discussion. Where the Commonwealth appeals from the grant of a defendant's motion for a new trial, we consider whether the judge committed a significant error of law or abuse of discretion in allowing the defendant's motion. Commonwealth v. Kolenevic, 471 Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017). The issue is whether the judge's decision resulted from "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). Id., quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." Commonwealth v. Cousin, 478 Mass.

608, 615 (2018), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986).  "We review de novo any findings of the motion judge that were based entirely on the documentary evidence," which, in this case, includes the affidavits.  Commonwealth v. Thomas, 469 Mass. 531, 539 (2014).  "We accept other findings that were based on testimony at the evidentiary hearing and do not disturb them where they are not clearly erroneous."  Id.  "However, we 'make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found.'"  Id., quoting Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011).

In Drayton I, this court held that Debra's affidavit may be admissible if it meets the two-part test set forth in Chambers, 410 U.S. at 302.[11]  Drayton I, 473 Mass. at 36.  In Drayton I, we also held that the first part of that test, whether the affidavit would have been critical to the defense, was clearly satisfied in this case.  Id.  We left undecided three distinct issues to be addressed at the evidentiary hearing on remand. First, the motion judge was to determine whether the affidavit met the second part of the test for admissibility, which examines whether the affidavit bears "persuasive assurances of

_____

[11] The Commonwealth argues that we should overturn our decision in Drayton I insofar as it recognizes a constitutionally based exception to the hearsay rule.  For the reasons stated in Drayton I, we decline to do so.

trustworthiness." See id., quoting Chambers, supra. Second, if the affidavit were determined to be admissible, the motion judge then had to determine whether the affidavit was properly viewed as newly discovered evidence. Drayton I, supra at 38-39. Third, the judge had to determine whether the affidavit casts real doubt on the justice of the defendant's convictions. Id. We address each of these issues in turn.

a. Whether the affidavit bears persuasive assurances of trustworthiness. Because the affidavit "plainly would have been critical to the defense," we held in Drayton I that the admissibility of the affidavit depended on whether it bears "persuasive assurances of trustworthiness." Drayton I, 473 Mass. at 36, quoting Chambers, 410 U.S. at 302. We also highlighted several elements that seemed to support the affidavit's trustworthiness. See Drayton I, supra at 36-38. Following the evidentiary hearing, the motion judge found that the affidavit does bear persuasive assurances of trustworthiness because of Debra's impending death, the absence of any other motive, and the corroboration that exists for the affidavit.

The motion judge found that Debra's statements were "motivated by her certain impending death and her desire to clear her conscience in the brief time remaining to her." In Drayton I, we drew parallels between the reliability of Debra's statements, in light of her impending death, and the reliability

of statements that fall within the dying declaration exception. Id. at 37 ("while Debra's affidavit fails to satisfy the technical requirements for the dying declaration hearsay exception, it appears to fall within the rationale for that exception"). The motion judge found that "[t]he facts revealed by the evidentiary hearing" supported this conclusion because Debra appeared sickly and emotional and died soon after signing the affidavit. The motion judge also credited Grossberg's testimony about Debra's health and demeanor at the time that she signed the affidavit.

The motion judge also found no evidence of any motivation for Debra coming forward other than her desire to clear her conscience. See Drayton I, 470 Mass. at 37 (absence of motive to lie "tend[s] to support the trustworthiness of Debra's statement"). Betty Jo stated in her affidavit that "just before" Debra died, Debra told Betty Jo "that she wanted the truth to be known about the shooting in . . . Jackson's apartment." The motion judge was further persuaded by the fact that Debra contacted Grossberg unprompted and "out of the blue." Grossberg testified that he searched for Debra both before and after the trial but was unsuccessful. The motion judge also observed that there is no evidence of any connection between Debra and the defendant that would have motivated her to come

forward and lie on his behalf.[12]  We highlighted the absence of a motive for Debra as potentially persuasive in Drayton I and something that could be brought out at the evidentiary hearing. See id. at 37 & 38 n.6.  After both sides were given the opportunity to develop the record at the hearing, the motion judge ultimately found that "no evidence of any other motivating circumstance was presented."

Another element that the motion judge found persuasive was the corroboration that exists for Debra's statements.  In Chambers, the United States Supreme Court found it persuasive that the statements at issue in that case were "corroborated by some other evidence in the case."  Chambers, 410 U.S. at 300-301.  Here, as the motion judge correctly observed, Debra's affidavit is corroborated by Betty Jo's affidavit and Anderson's

---

[12] We also note that the judge concluded that the statements Debra gave to Grossberg, rather than those given to the police, are more likely to be true.  As Debra explained in her affidavit, Debra had various reasons to lie in her initial statement to the police.  The affidavit stated that she was "afraid" and that she "did not want to get involved in the case."  She also stated that the officers "kept coming to [her] home and harassed [her] children and family until [she] agreed to meet with [them]" and that they "told [her] that they would take care of arrest warrants pending against [her]."  Thus, while Debra had ample motivation to lie in her original statement to the police, there is no evidence of any motivation to lie in her affidavit.  We discern no error in the judge's analysis.

affidavits.  The motion judge found each of these affidavits to be credible, particularly the affidavit of Betty Jo.[13]

We discern no error in the judge's analysis or determination that Debra's affidavit bears "persuasive assurances of trustworthiness."  Our own analysis confirms his findings.  We reiterate that this exception is very narrow and will be applicable "only in the rarest of cases."  Drayton I, 473 Mass. at 40.  This case, however, is one in which the application of this constitutional exception is appropriate.

b.  Whether the affidavit constitutes newly discovered evidence.  "Where the defendant moves for a new trial on the basis of newly discovered evidence, the defendant 'must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction,' which entails a showing that it "'probably would have been a real factor in the jury's deliberations.'"  Drayton I, 473 Mass. at 31, quoting Grace, 397 Mass. at 305-306.  Although "[t]he inquiry into whether the defendant has satisfied the new trial standard is conceptually distinct from the threshold inquiry

---

[13] Neither Betty Jo nor Anderson testified at the hearing. Betty Jo died prior to the hearing, and Anderson could not be located.  The motion judge, however, credited Grossberg's testimony concerning the circumstances that prompted Betty Jo and Anderson to provide their affidavits.  Our analysis of the documentary evidence is consistent with the judge's analysis, and we defer to his finding on credibility regarding Grossberg.

into whether Debra's affidavit is admissible [evidence], . . . many of the same considerations that inform a judge's assessment of the affidavit's trustworthiness may well also inform the judge's assessment whether it casts real doubt on the justice of the conviction."  Drayton I, supra at 39.

"To establish that evidence is 'newly discovered,' the defendant must show that the evidence was 'unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial."  Drayton I, 473 Mass. at 39, quoting Grace, 397 Mass. at 306.  The motion judge correctly concluded that the statements in Debra's affidavit were newly discovered evidence.

It is undisputed that Debra was unavailable at the time of trial.  Additionally, the motion judge found that, even if Betty Jo were called as a witness at trial, Grossberg had no reason to believe that she had any exculpatory information contradicting Jackson's testimony until after the defendant's convictions.  In support of this, the judge pointed to her testimony at the suppression hearing one month before the trial, in which she merely repeated the story she told police and refused to speak with Grossberg.  At trial, her attendance had to be secured by a capias.  Given Betty Jo's uncooperativeness and her prior testimony, there was no reason to believe that had she been called as a witness at trial, she would have revealed any of the

information contained in Debra's affidavit. The motion judge properly found that, even if she knew of Debra's statements at the time of trial, Betty Jo's consistently uncooperative behavior prior to trial strongly suggests that she would not have revealed these statements if the defense called her to testify. Again, we discern no error in the judge's analysis.

c. Whether the affidavit casts real doubt on the justice of the convictions. A new trial is warranted "[w]here we determine that newly discovered evidence likely would have functioned as a real factor in the jury's deliberations." Commonwealth v. Cowels, 470 Mass. 607, 623 (2015). In determining whether the newly discovered evidence would have been a real factor in the jury's deliberations, we focus on "what effect the omission might have had on the jury" rather than on whether the verdict would have been different. Id., quoting Commonwealth v. Tucceri, 412 Mass. 401, 411 (1992). "The over-all strength or weakness of the evidence presented against a defendant is significant . . . because it provides the context within which to assess whether the newly discovered evidence would have been a real factor in the jury's deliberations." Cowels, supra.

While "[n]ewly discovered evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial," Commonwealth v. Toney, 385 Mass. 575, 581

(1982), a new trial may be warranted where, as here, the Commonwealth's case depends on the testimony of a single witness and the newly discovered evidence contradicts that testimony. See Cowels, 470 Mass. at 621.[14]

The motion judge found that Debra's affidavit has precisely that effect in this case. We agree. The Commonwealth's case against the defendant depended on the testimony of Jackson, a witness with extensive credibility issues. The motion judge properly recognized that, beyond Jackson's testimony, there was no evidence that pointed to the defendant as the person who killed Greene. The statements in Debra's affidavit do more than just impeach Jackson's testimony; they undermine the

---

[14] In Commonwealth v. Cowels, 470 Mass. 607 (2015), the defendants were convicted of murder in the first degree in the stabbing death of the victim. The Commonwealth's main witness testified to a timeline that placed the defendants at the witness's apartment at various points throughout the night, first with the victim and then later without her. Id. at 609-610. The witness testified that when the defendants returned without the victim they borrowed some clothes and made various threatening statements indicating that they had killed the victim. Id. The only physical evidence linking the defendants to the witness's home were two towels with bloodstains, one of which was too small to be tested. Id. at 610-611. After the defendants were convicted, deoxyribonucleic acid (DNA) testing revealed that the blood on the towel did not belong to either of the defendants or the victim. Id. at 614. The defendants sought a new trial on the basis of this and other newly discovered evidence, but the trial judge denied the motion. Id. at 614-615. On appeal, we concluded that a new trial was warranted because the DNA testing negated key pieces of evidence that likely were a real factor in the jury's deliberations. Id. at 623-624.

Commonwealth's entire case against the defendant.  Therefore, the statements are more than just mere impeachment evidence and are a sufficient basis for a new trial.

The motion judge accordingly concluded that Debra's affidavit likely would have been a "significant factor" in the jury's deliberations in this case.  We also agree with this determination.  The Commonwealth's over-all case against the defendant was dependent on Jackson's testimony, which Debra directly contradicted.  There was also little evidence to corroborate Jackson's testimony.  The motion judge therefore properly concluded that Debra's affidavit cast real doubt on the justice of the convictions.

3.  Conclusion.  For these reasons, we hold that the motion judge did not abuse his discretion in concluding that the affidavit is admissible and newly discovered evidence that casts real doubt on the justice of the defendant's convictions and that, therefore, the defendant is entitled to a new trial.  The judgments of conviction are vacated and set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.