LENK, J.
**838 *849 The defendant, convicted of murder in the first degree in the 2009 shooting death of Vincent Gaskins, appeals from the denial of his second motion for a new trial. The defendant previously brought a consolidated appeal from the denial of his first motion for a new trial and his conviction. He claimed error in, among other grounds, the Commonwealth's failure or inability to disclose to him the name of a confidential informant who appeared to have information about the murder. While otherwise rejecting the claims of error at trial as to the record then before us and declining to provide relief under G. L. c. 278, § 33E, we agreed that the defendant's pretrial motion to obtain the identity of a confidential informant had been denied without proper appraisal. See Commonwealth v. Bonnett, 472 Mass. 827, 849-851, 37 N.E.3d 1064 (2015) ( Bonnett I ). We accordingly remanded for a hearing under the framework set forth in **839 Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). See Bonnett I, supra at 846-850, 37 N.E.3d 1064. We noted that if "new circumstances permit[ted] the informant's identity to be disclosed ..., the defendant [could] seek a new trial upon a showing that newly discovered evidence would probably have been a real factor in the jury's deliberations." Id. at 850, 37 N.E.3d 1064 n.26.
Because the requisite disclosures concerning the identity of the confidential informant had been made by the time of the rehearing, the defendant did not pursue a full Roviaro inquiry; he instead brought a second motion for a new trial in light of the newly available evidence. The new evidence in essence consisted of inculpatory statements assertedly made to three individuals by the now-deceased Brandon Payne, who also was present on the night of the shooting. After an evidentiary hearing on the motion for a new trial, in which a judge heard from the previously confidential informant and from two of the defendant's friends, the motion judge found that the defendant had not met his burden of showing that the new evidence was material and credible, or that it cast real doubt on the justice of his conviction.
On appeal before us, the defendant argues that the motion judge abused his discretion in denying the second motion for a new trial. Discerning no clear error or abuse of discretion, we affirm the judge's decision. We also decline to exercise our power under G. L. c. 278, § 33E, to reduce the verdict or to grant a new trial.
1. Background and procedural posture. The facts underlying the defendant's conviction are set forth in detail in Bonnett I, 472 Mass. at 828-832, 37 N.E.3d 1064. We focus our discussion on pertinent facts, supplementing as necessary, where relevant to the issues in this appeal.
a. The trial. On November 22, 2009, at approximately 1 A.M. , the victim was shot and killed in a parking lot across the street from a nightclub in Lynn. Surveillance footage taken from establishments located near the crime scene showed the shooting from a distance; the footage, however, was grainy and of poor quality.
The Commonwealth's case at trial centered on the testimony of the victim's cousin, Sheffery Johnson, who described the events that night.[1] Johnson testified that, *850 on the evening of the shooting, she picked up Brandon Payne in her truck and they drove to a parking lot located across the street from the nightclub.[2] As they **840 sat talking, Johnson saw the victim leaving the nightclub with his girlfriend. They were with or near a "dark skinned" man wearing a gray sweat suit, who Johnson identified at trial as the defendant.[3]
The victim and his girlfriend walked over to Johnson's truck, where several others had congregated after leaving the nightclub. As there had been tension between Payne and the victim following an altercation several months earlier, the two began arguing, and eventually ended up outside, at the back of the vehicle. Johnson watched them through the rear view mirror, and then got out to join them. Shortly thereafter, she noticed someone "pass [her]" and join the group; she was not focused on who it was.
During the argument, the victim suggested that he and Payne go around the corner and fight. After Johnson announced that there would be no fighting, she grabbed Payne and swung him around to get back into the vehicle. As soon as her back was turned, Johnson testified that she heard a "pop" from the direction in which the victim had been standing. When she turned around to face the victim, she saw the defendant standing over him, tucking a gun into his pants, and then running toward Tremont Street, with a group of about ten others.[4] At that point, Johnson was screaming at Payne because his friend had just shot her cousin.
Although no other witnesses who had been present that night were called to testify at trial, Johnson's testimony was corroborated, in part, by statements the defendant later made to Joseph Burns. Burns and the defendant knew each other because the defendant typically bought guns from Burns, in exchange for drugs.[5] When the defendant and Burns met up after the shooting, Burns inquired about that night. The defendant said that he and the victim "had words after the club," and that the defendant subsequently "shot him in the face." Burns also provided details **841 about the shooting that were not public knowledge at the time.[6] The Commonwealth presented testimony from the defendant's roommate, Thomas Arrington, who had seen the defendant with guns in the apartment on several occasions. Arrington had asked the defendant if he was involved in the shooting, and the defendant shrugged. *851 The testimony also was corroborated by forensic evidence. A .22 caliber firearm, which had been discarded in nearby bushes on Tremont Street, was discovered by police shortly after the shooting. Two latent prints and a deoxyribonucleic acid (DNA) profile were recovered from the firearm. A forensic examiner opined that the palm print, found on the back of the firearm, matched the defendant's.[7] The major DNA profile taken from the firearm also matched the defendant's.[8] The jury returned a verdict of guilty of murder in the first degree on a theory of deliberate premeditation.
b. Disclosure of the confidential informant. Shortly before trial, the defendant's counsel had received a copy of a redacted report prepared by the Federal Bureau of Investigation (FBI). The report stated that a "cooperating witness" had heard that the "word on the streets of Lynn" was that "PAYNE shot and killed [the victim]," and that, at Payne's request, the defendant had disposed of the weapon after the shooting.
Defense counsel moved for an order requiring disclosure of the informant's identity, and a judge asked the Commonwealth to inquire whether the officials were able to disclose the information. After speaking with Federal officials, the prosecutor reported that the government was unable to disclose the informant's identity at that time, due to an ongoing investigation.[9] The judge stated that he could not compel the Federal government, as a "separate sovereign," to disclose the information, and accordingly **842 denied the defendant's motion. Defense counsel was precluded from inquiring at trial about the contents of the report or the informant's identity.
Following the remand in Bonnett I for a proper determination whether disclosure of the informant's identity was necessary, the Commonwealth provided the defendant with the informant's name, Victor Bizzell, along with a recording of a recent police interview with Bizzell. The defendant also obtained an unredacted copy of the FBI report. In light of this, the Commonwealth, the defense, and the judge appeared to agree that the Roviaro issue was "sort of a moot point."
c. Roviaro hearing. In June 2016, a Superior Court judge nonetheless conducted the first stage of a Roviaro hearing as though the case were being heard in 2012.[10] The agent who prepared the FBI report in 2012 testified; he reported that the FBI had established a special task force to investigate gang activities on the North Shore. As part of the investigation, officers from the Lynn police department were granted "Title 21 and Title 18 authority to conduct [F]ederal investigations." The FBI provided them with various resources, including money to pay "cooperating witnesses" to conduct controlled "buys." The task force used Bizzell as one such cooperating witness.[11]
*852 During one of their daily conversations, Bizzell told the agent that the "rumor on the street" was that Payne was taking responsibility for the victim's death in this case. The FBI agent subsequently pressed Bizzell for details surrounding the shooting, but Bizzell maintained that it was an unsourced rumor; that "everyone on the street [knew] it." A redacted version of the agent's report of this conversation had been provided to the defendant's **843 counsel in advance of trial in 2012.[12]
The judge found that, notwithstanding the proper invocation of informant privilege, the defendant also established that the nondisclosure interfered with his right to present a defense. The judge, however, left the decision whether to continue with the second stage of the Roviaro inquiry to the parties, given its apparent mootness. The defendant did not pursue further findings; he instead filed a second motion for a new trial, based on newly available evidence.
d. Second motion for a new trial. In February and March of 2017, a third Superior Court judge held evidentiary hearings on the defendant's second motion for a new trial. The judge had before him the following: a redacted copy of the FBI report (given to the defendant before his trial in 2012); an unredacted copy of the FBI report (given to the defendant upon remand); a recording and transcript of a subsequent police interview with Bizzell (from May 2016); and an article that Payne had been shot and killed by Lynn police in 2012. The judge also had supporting affidavits from two new witnesses, Robert Brown and Bernard Edwards.
At the evidentiary hearing, the judge heard testimony from Bizzell, Brown, Edwards, and the defendant's trial counsel. The judge credited trial counsel but made detailed factual findings regarding his reasons for strongly discrediting the testimony from Bizzell, Brown, and Edwards; central among them was a clear motive to assist the defendant by implicating a now-deceased individual. Because the defendant had not met his burden of showing that the newly discovered evidence was "material and credible, or cast[ ] real doubt on the justice of his conviction for first degree murder," the judge denied the defendant's second motion for a new trial. The defendant timely appealed.[13]
2. Discussion. We review the denial of a motion for a new trial "only to determine whether there has been a significant error of **844 law or other abuse of discretion." Commonwealth v. Grace, 397 Mass. 303, 307, 491 N.E.2d 246 (1986). Where, as here, "the motion judge did not preside at trial, we defer to that judge's assessment *853 of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." Commonwealth v. Drayton, 479 Mass. 479, 486, 96 N.E.3d 163 (2018), quoting Commonwealth v. Cousin, 478 Mass. 608, 615, 88 N.E.3d 822 (2018).
a. Newly available evidence. To prevail on a motion for a new trial based on new evidence, a defendant must establish "both that the evidence is newly discovered [or newly available] and that it casts real doubt on the justice of the conviction." Grace, 397 Mass. at 305, 491 N.E.2d 246. See Commonwealth v. Sullivan, 469 Mass. 340, 350, 14 N.E.3d 205 (2014).[14] "The evidence said to be new not only must be material and credible but also must carry a measure of strength in support of the defendant's position" (citation omitted). Grace, supra. The defendant also must show "that any newly discovered evidence is admissible." See Commonwealth v. Weichell, 446 Mass. 785, 799, 847 N.E.2d 1080 (2006). In evaluating whether newly discovered evidence casts real doubt on the justice of a conviction, "[t]he motion judge decides not whether the verdict would have been different," Grace, supra at 306, 491 N.E.2d 246, "but whether the evidence probably would have been a 'real factor' in the jury's deliberations." Sullivan, supra at 350-351, 14 N.E.3d 205, quoting Grace, supra.
The motion judge here assumed, and the Commonwealth agrees, that the evidence at issue constitutes newly discovered material.[15] The Commonwealth also does not dispute that the evidence is admissible.[16] The defendant's main challenge on appeal, then, is to the judge's conclusions regarding the effect of the **845 new evidence and whether it casts doubt on the justice of the conviction. We begin by setting forth the contents of the new evidence considered by the motion judge.
At the hearing, the judge heard testimony from Bizzell, a fellow member of the gang to which the defendant and Payne belonged.[17] In contrast to Bizzell's 2012 statement to the FBI, in which he reported that the "rumor on the street" was that Payne shot the victim, Bizzell suggested at the evidentiary hearing that he had specifically *854 spoken with Payne about the shooting on two occasions. Bizzell characterized those discussions as Payne just taking "credit for [the shooting]" among fellow gang members, and saying that the killing was "work he put in." Bizzell also reported that, when he and others in the gang spoke to Payne about the shooting, they had been "clowning," or teasing him, and were giving him "grief" for having had the defendant "do the work for him." It was in response to their taunting that Payne claimed responsibility for shooting the victim. Bizzell relayed also that the defendant had confessed that he shot the victim, notwithstanding Payne's attempts to convince their fellow gang members otherwise.
Brown, a family friend of Payne, also testified at the hearing; he stated that, after the defendant had been convicted, Brown agreed to drive Payne to pick up money to send to someone. While the two were driving, Payne told Brown that he had "caught a body,"[18] and that someone else "went down for it." Brown testified that he later came to understand that Payne was referring to the defendant, and that they were picking up money to send to the defendant. Brown came to this realization when he met the defendant in prison, at which time he and the defendant became aware of their mutual connection in Payne.[19]
The judge also heard testimony from Edwards, a fellow member of the gang, who relayed that he had had three conversations **846 with Payne concerning the shooting. Edwards reported that, in the first conversation, he asked Payne about the events at the nightclub, and Payne responded that he "had to get [him] up out of here." Edwards remembered Payne saying in the second conversation that "he felt bad" that "his boy was doing time ... for him." Edwards could not recall any specific statements that Payne had made in the third conversation, but Edwards could tell by Payne's body language that he felt badly about the situation and that he was "f'd up about it."
In a detailed memorandum of decision, the judge deemed the testimony submitted by these witnesses to be contradictory, insincere, and not credible, ultimately concluding that the evidence did not carry support for the defendant's position that Payne had shot the victim.[20] Specifically, the judge did not credit Bizzell's testimony, due, in part, to his poor demeanor, inability to remember details, apparent insincerity, and contradictory testimony on numerous occasions. Nor did the judge credit the testimony presented by Brown, in part, because of his admission that he was there to "help" the defendant. The judge similarly did not give credence to the story presented by Edwards, in part because Edwards admitted that he would lie for a fellow gang member, "depend[ing] on the person." Noting that Payne had died in 2012 and, accordingly, could be blamed for any incident without fear of reprisal, the judge concluded that these individuals had a motive to assist the defendant -- as a friend, acquaintance, or fellow gang member -- with their statements. As the new evidence was not deemed sufficiently material or credible, the judge concluded that it did not cast real doubt on the justice of the defendant's *855 conviction. See, e.g., Grace, 397 Mass. at 305, 491 N.E.2d 246.
In this appeal, the defendant contends that the judge's assessment of the credibility of the witnesses at the hearing on the second motion for a new trial constituted an abuse of discretion. We have long held, however, that a motion judge must assess whether new evidence is "credible" to warrant the grant of a new trial. See, e.g., Commonwealth v. Lessieur, 472 Mass. 317, 331-332, 34 N.E.3d 321, cert. denied, --- U.S. ----, 136 S. Ct. 418, 193 L.Ed.2d 328 (2015) ; Commonwealth v. Rosario, 460 Mass. 181, 195-196, 950 N.E.2d 407 (2011) ; Commonwealth v. Santiago, 458 Mass. 405, 415-416, 937 N.E.2d 965 (2010) ; Grace, 397 Mass. at 305-306, 491 N.E.2d 246. Indeed, the function of a judge assessing live testimony **847 at a new trial hearing is to consider its credibility and materiality, as well as the appropriate weight given to it, in light of the entire trial record. Cf. Commonwealth v. Sparks, 433 Mass. 654, 661, 746 N.E.2d 133 (2001) (judge's assessment of witness credibility at evidentiary hearing on motion for new trial is "final and conclusive"); Commonwealth v. Bernier, 359 Mass. 13, 16, 267 N.E.2d 636 (1971) ("The credibility of the affiant and the witnesses [is] a preliminary matter for decision by the trial judge and his decision thereon is final").
The cases upon which the defendant relies in support of his argument that it is an abuse of discretion for a motion judge to assess a witness's credibility at a hearing on a motion for a new trial are inapposite here. See, e.g., Commonwealth v. Galloway, 404 Mass. 204, 208, 534 N.E.2d 778 (1989) ; Commonwealth v. Nutbrown, 81 Mass. App. Ct. 773, 779-780, 968 N.E.2d 418 (2012). Those cases address the threshold inquiry whether evidence is admissible at trial, specifically, whether an unavailable declarant's statement against penal interest is admissible. "An out-of-court statement 'is admissible under the penal interest exception [to the hearsay rule] if (1) the declarant's testimony is unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its trustworthiness.' " Commonwealth v. Carriere, 470 Mass. 1, 17, 18 N.E.3d 326 (2014), quoting Commonwealth v. Charles, 428 Mass. 672, 677, 704 N.E.2d 1137 (1999). See Mass. G. Evid. § 804(b)(3) (2019).
The defendant is correct that a trial judge errs in considering a witness's credibility when making a preliminary determination as to the admissibility of a statement against interest. See Galloway, 404 Mass. at 208, 534 N.E.2d 778 (when evaluating admissibility of declarant's statement against interest, judge determines whether underlying statement is corroborated by evidence indicating its trustworthiness, while jury assess credibility of witnesses); Nutbrown, 81 Mass. App. Ct. at 773, 779-780, 968 N.E.2d 418 (motion judge "impermissibly considered the credibility of the witnesses rather than that of [the declarant]" in evaluating admissibility of statement against interest). "[T]he inquiry into whether the defendant has satisfied the new trial standard," however, "is conceptually distinct from the threshold inquiry into whether [a witness's] affidavit [or testimony] is admissible" (citation omitted). See Drayton, 479 Mass. at 489, 96 N.E.3d 163. As to whether a new trial is warranted, it is well established that a motion judge may consider the credibility of proffered **848 evidence, which here includes witness testimony, in determining whether *856 the evidence casts real doubt on the justice of the conviction. See Grace, 397 Mass. at 305-306, 491 N.E.2d 246.
We thus defer to the motion judge's assessment of the various witnesses' credibility at the hearing on the motion for a new trial, but we need not accord deference to his review of the documentary evidence or trial transcripts, which we review independently. See Drayton, 479 Mass. at 486, 96 N.E.3d 163 ; Grace, 397 Mass. at 307, 491 N.E.2d 246. We regard ourselves in as good a position as the motion judge to assess the record. See Drayton, supra ; Grace, supra. The Commonwealth's case at trial included a confession made by the defendant, to Burns, that he had shot the victim in the head following an altercation outside a nightclub. The victim's cousin, who was with Payne when they heard the gunshot go off, also testified that she observed the defendant tucking a gun into his pants and running from the scene. The firearm later recovered from the bushes contained a palm print and DNA, both of which matched the defendant's.
Although the new witnesses suggest that Payne shot the victim, the judge did not credit their testimony. Even assuming that the judge had credited Bizzell, part of his testimony was that the defendant had admitted to killing the victim. In any event, the testimony of the three witnesses was not inconsistent with Payne merely taking credit for a shooting that he had asked his friend to carry out, and about which he later felt badly as his request had resulted in the defendant's incarceration. In light of the strength of the forensic and testimonial evidence offered against the defendant at trial, we discern no abuse of discretion in the motion judge's conclusion that the new witnesses, who, years later, offered testimony implicating someone else, were neither credible nor material, and did not cast real doubt on the justice of the defendant's conviction. See Sullivan, 469 Mass. at 351, 14 N.E.3d 205, quoting Commonwealth v. Cintron, 435 Mass. 509, 517, 759 N.E.2d 700 (2001) ("In the absence of a constitutional error, the granting of a motion for a new trial on the ground of newly discovered evidence rests in the sound discretion of the judge"). Accordingly, we affirm the denial of the defendant's second motion for a new trial.
b. Extraordinary relief. The defendant also asks us to exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict. Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the entire record carefully, and **849 we discern no cause to exercise our extraordinary power in this case.
3. Conclusion. The defendant's conviction and the order denying his second motion for a new trial are affirmed.
So ordered.

Prior to trial, Sheffery Johnson had been shot and seriously injured. A 2016 affidavit from one of the new witnesses claimed that Brandon Payne said he did not want Johnson to testify, and that he "wanted her taken care of so she couldn't."

At the time, Johnson apparently was beginning a relationship with Payne.

On cross-examination, Johnson was impeached with the fact that she had been unable to identify the defendant in a photographic array, conducted in the weeks following the shooting.

At trial, Johnson was impeached with her grand jury testimony. Before the grand jury, she had testified that she saw the defendant put "something" in his pants. A police officer also testified that, during an interview after the shooting, Johnson had said that she did not see a gun. Neither Payne nor the victim's girlfriend testified at the trial.

Burns stated that he was cooperating in the hopes of reducing the Federal sentence he was then serving.

Burns testified that the defendant said words to the effect of going "around the corner" during an altercation with the victim. Burns also knew that the gun "didn't have a clip to it so there was only one round in it, in the chamber." The public was never informed about the victim's having said anything about going around "the corner" to fight, or that the firearm did not have a magazine in it when it was recovered.

The second latent print was not of sufficient quality or quantity to allow the analyst to render an opinion.

Payne could not be excluded as a potential contributor to the deoxyribonucleic acid mixture taken from the firearm.

The prosecutor reported that the informant might be "in a position to testify" at some later date, once the investigation had concluded.

With the trial judge having retired, a different Superior Court judge held the Roviaro hearing.

The Federal Bureau of Investigation (FBI) now refers to all witnesses as "confidential human source[s]." The agent noted, however, that, at the time of the investigation, the FBI distinguished between a "cooperating witness" and a "confidential informant"; the former was in a position to testify at trial, while the latter was not. The terminology used within the report meant that Victor Bizzell would be in a position to testify, once the FBI's investigation had concluded and the suspects had been indicted. At the time of the defendant's trial, however, the investigation had not yet concluded. The agent testified further that, because Bizzell's life would have been in danger and the FBI's gang investigations would have been compromised, the FBI would have been unable to disclose his identity at the time of the defendant's trial in 2012.

The redacted version of the report contained information about the defendant's and Payne's involvement in the shooting of the victim. The unredacted version provided the names of several individuals to whom Payne had spoken concerning other gang matters the FBI was investigating. Neither the redacted report nor the unredacted report mentioned Bizzell's name.

Because the defendant preserved the Roviaro issue, we stated that "the reconsidered decision on the merits of his pretrial motion -- and, if that motion is allowed, the decision as to whether information uncovered as a result warrants a new trial -- will be appealable as decisions on a postconviction motion filed before direct appeal." Commonwealth v. Bonnett, 472 Mass. 827, 851, 37 N.E.3d 1064 (2015).

The standard applied when reviewing a motion for a new trial based on newly available evidence is the same as that applied to such a motion based on newly discovered evidence. See Commonwealth v. Sullivan, 469 Mass. 340, 350 n.6, 14 N.E.3d 205 (2014).

Because Bizzell's identity was made unavailable to the defendant at the time of his trial due to an informant privilege, it is newly available. Cf. Sullivan, 469 Mass. at 350 n.6, 14 N.E.3d 205 (newly available evidence is that which is unavailable at time of trial for reasons such as assertion of privilege). We similarly conclude that Bernard Edwards's testimony was new, because the defendant could not have uncovered it without access to the unredacted FBI report. Finally, because Robert Brown's conversation with Payne occurred after the defendant's trial had concluded, it was, necessarily, unavailable to the defendant at his trial.

Payne's statements likely would be admissible as a statement against his penal interest given that (1) the declarant is deceased and unavailable; (2) the statement tends to subject him to criminal liability such that a reasonable person "would not have made the statement unless he believed it to be true"; and (3) the statement, offered to exculpate the defendant, could meet the relatively low bar for corroborating circumstances indicating its trustworthiness (citation omitted). See Commonwealth v. Weichell, 446 Mass. 785, 802-803, 847 N.E.2d 1080 (2006).

At the hearing, Bizzell was reluctant to respond to any questions posed to him; when he did participate, his testimony appeared to contradict what he said in 2012 and, at times, what he reported in a 2016 police interview.

Brown testified that the term "caught a body" meant that he had killed someone.

At the time of his testimony, Brown was incarcerated; he had met the defendant while they were incarcerated together at a different location.

The judge explicitly noted that the only witness he credited was the defendant's trial counsel, who testified, in relevant part, that he had not interviewed or been contacted by any of these three men prior to trial.