NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11459

COMMONWEALTH  vs.  ROBERT L. UPTON.


Barnstable.      October 2, 2019. - February 19, 2020.

Present (Sitting at Barnstable):  Gants, C.J., Lenk, Gaziano,
Lowy, Budd, Cypher, & Kafker, JJ.


Homicide.  Evidence, Conflicting statements of witness,
    Credibility of witness, Impeachment of credibility, Prior
    misconduct.  Witness, Credibility, Impeachment.  Practice,
    Criminal, Agreement between prosecutor and witness, New
    trial, Capital case.



Indictments found and returned in the Superior Court
Department on December 18, 2009.

The cases were tried before Gary A. Nickerson, J., and
motions for a new trial, filed on December 31, 2014, and
February 2, 2018, respectively, were considered by him.


Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
Elizabeth A. Sweeney, Assistant District Attorney, for the
Commonwealth.


LOWY, J.  A jury convicted the defendant, Robert L. Upton,

of murder in the first degree on the theories of deliberate

premeditation and felony-murder with the predicate felony of

attempted armed robbery, for shooting the brother of his sister's husband. The jury also convicted the defendant of aggravated assault and battery by means of a dangerous weapon, and of armed assault in a dwelling house. On appeal, the defendant contends that newly discovered evidence comprised of, among other components, subsequent contradictory testimony by the Commonwealth's key witness indicates that the prosecution failed to disclose a plea agreement at the time of trial in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963), and that the Superior Court judge erred in denying his second motion for a new trial without an evidentiary hearing on the matter.[1] Because we find no abuse of discretion, we affirm. We also affirm the defendant's convictions and decline to exercise our authority under G. L. c. 278, § 33E, to reduce or set aside the verdict on the murder conviction.

Background. We recite facts that the jury could have found and that are necessary to resolve the defendants' appeal, reserving some facts for later discussion. Commonwealth v. Barry, 481 Mass. 388, 390 (2019), cert. denied, 140 S.Ct. 51 (2019).

---

[1] The defendant appealed from the denial of his first motion for a new trial, yet did not discuss the issues in his brief or in any supplemental filings. Still, pursuant to G. L. c. 278, § 33E, we have reviewed the motion and the motion judge's reasoning and decision, and we have found no error.

On the night of September 29, 2009, the defendant and his nephew, Christopher Manoloules, went to the Hyannis house of the victim, Aris Manoloules.  The next day, the police found the victim shot four times, including once in the back of his head.

The murder plot involved a complicated family dynamic stemming from the 2007 death of the family matriarch, who had had three children:  Treefon Manoloules, Irene Manoloules, and the victim.  The matriarch bequeathed her entire $2 million estate to the victim, who had been her sole caretaker while she suffered from multiple sclerosis.  The defendant's sister joined the Manoloules family by marrying Treefon, and Christopher, who was seventeen at the time of the murder, was their son.[2]

Christopher was a troubled youth, and his father exacerbated those problems.  Christopher testified that when he was fifteen years old, Treefon had him illegally drive a vehicle and buy bulk amounts of marijuana.  In addition, after the death of Christopher's grandmother, Treefon, who wanted his share of the inheritance, involved Christopher in several unsuccessful plots to kill the victim, including by a heroin overdose. Through these troubles, the defendant remained largely absent from Christopher's life until 2009.

---

[2] We refer to Christopher, Treefon, and Irene by their first names.

In May 2009, the defendant moved in with his girlfriend. Between then and September 2009, the defendant experienced significant financial difficulty, including the loss of his job in July. He owed his girlfriend's father $10,000, and a car dealership repossessed, for lack of payment, a $77,000 Mercedes vehicle that he had purchased for his girlfriend in July 2009. It was during this time that Treefon reached out to the defendant to mentor Christopher.

During the week leading up to the murder, the defendant, in short order, fostered a criminal entrepreneurship in his nephew. The defendant informed Christopher that an individual was going to kill the defendant's older daughter if the defendant did not repay a debt of $165,000. As this alleged threat involved his cousin, Christopher wanted to help. The defendant proposed several plans to obtain the money, including theft of automobiles. Christopher asked one of his friends to assist in the endeavor. When, after a couple of days, the threesome failed to obtain money illicitly, Christopher spoke to Treefon about the defendant's predicament.

With Christopher and Christopher's friend present, Treefon offered to pay the defendant $165,000 to kill the victim by shooting him. On the day of the murder, Treefon insisted that the defendant purchase a gun; the defendant complied, buying a nine millimeter Ruger pistol and a box of ammunition. Treefon

told Christopher to use a ruse to convince the victim to allow Christopher, with the defendant in tow, to visit the victim at his Hyannis house.  Despite having offered to pay the defendant to kill the victim, Treefon assured Christopher that the real plan involved only stealing the matriarch's jewelry.

Christopher testified that the defendant drove him to the victim's house.  They entered through the unlocked front door, and then sat with the victim in his family room.  Christopher excused himself on the pretense of going to the bathroom, but he instead proceeded to search the victim's bedrooms for the jewelry.  Finding none, Christopher called the defendant into the kitchen, informed him that there was no jewelry, and asked to leave.  The defendant pulled out the Ruger, cocked the hammer, and walked back into the family room where the victim was watching a Red Sox game.  Christopher heard four gunshots.

After the murder, the defendant dropped off Christopher at his parent's home and spoke to Treefon.  The defendant returned to his girlfriend's home at around 1:30 A.M. on September 30, 2009.  That afternoon, the defendant's girlfriend arrived home from work, saw the defendant cleaning a disassembled gun on a table, and asked him to remove it.  Approximately ten to fifteen minutes later, she saw that the gun was gone.

That same day, Treefon requested that the police conduct a wellness check on the victim.  Shortly after 5:35 P.M., the

police discovered the victim's body on the floor of his family room, with four spent shell casings in the area. At around midnight, the police arrested Christopher at his parents' house.

On October 1, 2009, the police interrogated the defendant, and he told a story littered with inconsistencies and denials. He admitted to buying the Ruger and ammunition on September 29, 2009, but claimed that he had not seen the gun or ammunition since that night after he locked the gun in a case and placed the case and the ammunition in the trunk of his car. The defendant also denied being present on Cape Cod on the night of the murder, but later acknowledged that he drove there with Christopher. The defendant subsequently admitted to dropping Christopher in a Hyannis parking lot between 9 P.M. and 10 P.M. so that Christopher could meet with an unidentified individual. The defendant stated that he had remained in the vehicle. He justified his earlier misleading statements as an attempt to protect Christopher, and he never provided details about being at the victim's house.

On December 11, 2009, the Commonwealth indicted Christopher for murder in the first degree, assault by means of a dangerous weapon with the intent to murder, aggravated assault and battery with a deadly weapon, and armed assault in a dwelling. On December 18, 2009, the Commonwealth indicted the defendant on the same charges.

In July 2010, Christopher decided to cooperate with the police investigation and the prosecution. He told investigators about Treefon's orchestration of the murder plot and identified the defendant as the shooter. Christopher then testified for the Commonwealth at Treefon's trial for murder,[3] but the jury acquitted his father on all counts.

At the defendant's trial in January 2013, Christopher served as the Commonwealth's key witness. On the first day of trial, the defendant filed a motion in limine for an evidentiary hearing regarding undisclosed promises, rewards, and inducements to Christopher for his testimony, supported by an attorney's affidavit and a letter that Christopher's attorney sent to the prosecutors before trial admonishing their disclosure practices. However, the defendant then agreed to proceed to trial without a ruling on the motion.[4] Once on the stand, Christopher testified to the defendant's guilt, and denied doing so for any quid pro quo with the Commonwealth. In May 2013, four months after the defendant's trial concluded, Christopher nonetheless pleaded

---

[3] The Commonwealth also charged Treefon with two counts of conspiracy under G. L. c. 274, § 7, and an attempt to commit a crime under G. L. c. 274, § 6. The record does not provide details about the conspiracy or about the attempted crime.

[4] In response to the motion, the Commonwealth disclosed that they had only made one promise to Christopher in exchange for his testimony: "his statements would not be used against him at any proceeding where he was the defendant on trial."

guilty, inter alia, to manslaughter instead of murder, and received a sentence of from twelve to fifteen years.

The Commonwealth did not rely solely on Christopher's testimony to tie the defendant to the murder. Christopher's friend testified that he had heard Treefon offer to pay the defendant to kill the victim. In addition, forensic evidence established that the defendant's Ruger fired the bullets that killed the victim. According to the testimony of the defendant's girlfriend, she found the gun in her basement days after the defendant's interrogation and believed that the defendant had hidden it there after she demanded that he remove it from her home. Moreover, the Commonwealth's ballistics expert testified that four bullets were missing from the defendant's ammunition case, and that the bullets in the ammunition case were the same type of ammunition fired from the defendant's Ruger at the victim.

The Commonwealth also established that the defendant suffered from substantial financial woes, discussed supra. Significantly, on the day of the murder, the defendant sent a text message to a salesperson at the Mercedes dealership, in which the defendant expressed his belief that he would soon have enough money to pay for the Mercedes, and in which the defendant also stated that he would be getting the money from his "brother-in-law." The defendant did not testify.

Discussion. 1. Standard of review. Because we consider the "defendant's direct appeal from a conviction of murder in the first degree together with an appeal from the denial of a motion for a new trial, we review the whole case [pursuant to] G. L. c. 278, § 33E." Commonwealth v. Goitia, 480 Mass. 763, 768 (2018). We therefore review raised or preserved issues according to their constitutional or common-law standard and analyze any unraised, unpreserved, or unargued errors, and other errors we discover after a comprehensive review of the entire record, for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Brown, 477 Mass. 805, 821 (2017), cert. denied, 139 S. Ct. 54 (2018). For an error to have created a substantial likelihood of a miscarriage of justice, it must have been "likely to have influenced the jury's conclusion" (citation omitted). Goitia, supra.

2. Defendant's second motion for a new trial. "[T]he Commonwealth has an obligation to disclose the terms of any agreement, promise, or inducement proffered to a testifying witness before trial, and . . . a failure to do so may violate the defendant's right to due process." Commonwealth v. Rebello, 450 Mass. 118, 122 (2007). See Brady, 373 U.S. at 87. Despite the denials by Christopher and the prosecutor that any deal existed, the defendant argues that newly discovered evidence demonstrates that such a deal did exist in violation of Brady.

He asserts that he deserves a new trial because that evidence raises questions about the credibility of Christopher, the Commonwealth's key witness at the defendant's trial.

The circumstances giving rise to the defendant's claim are as follows. Sometime after the victim's death, Treefon and his sister, Irene, each inherited one-half of the victim's $2 million estate. As executrix of the victim's estate, Irene tried to recoup Treefon's share by filing a wrongful death action (civil action) against Treefon.[5] The trial in this action was held in 2016, three years after the defendant's trial. Christopher appeared as a witness defending Treefon, testifying that he had entered into an undisclosed plea deal with the Commonwealth at the time of both Treefon's and the defendant's criminal trials, notwithstanding his testimony to the contrary before the grand jury and at those trials. The jury in the civil action found Treefon not liable for the victim's death.

Following Christopher's testimony in the civil action (civil action testimony), the defendant filed a second motion for a new trial, which is part of this appeal, alleging that Christopher's civil action testimony, the jury's subsequent finding of no liability for Treefon, and Christopher's plea deal constituted "newly discovered evidence" that would have

_____

[5] The suit also named Christopher and the defendant as codefendants.

substantially affected the jury's deliberations in the defendant's criminal trial.[6]  To support the motion, the defendant attached excerpts from Christopher's civil action testimony, transcripts from Christopher's plea hearing, excerpts from Christopher's testimony in Treefon's criminal trial, and citations to arguments made during the defendant's criminal trial.  The defendant failed, however, to file any affidavits from Christopher's counsel or the prosecutors, or to file an affidavit stating that he attempted to obtain such affidavits.

The motion judge, who was also the trial judge, denied the second motion for a new trial without holding an evidentiary hearing, but issued a detailed memorandum of decision outlining

---

[6] The defendant also alleged that (1) Christopher's guilty plea demonstrated his culpability in the murder, undermining his trial testimony, and casting real doubt on the defendant's conviction; and (2) the civil jury's finding of no liability for Treefon proved that Treefon could not have hired the defendant to murder the victim, thus undermining the Commonwealth's entire theory at the defendant's trial.  Neither claim has any merit. First, even assuming the plea deal is newly discovered, Christopher's plea would only evidence a Brady violation if Christopher had admitted to the murder to the Commonwealth before trial and if the Commonwealth did not turn that information over to the defendant.  It also does not exculpate the defendant; at the very least, the plea shows that Christopher was complicit with the defendant.  The plea also would constitute cumulative impeachment evidence if admitted at trial because defense counsel repeatedly impeached Christopher's claims of innocence at trial.  See discussion infra.  Second, the civil action verdict cannot be newly discovered because it is not evidence.  Moreover, the civil trial involved different burdens on the parties and different burdens of proof.  It had a different trier of fact, and different testimony upon which the jurors reached their conclusion.

why the defendant's evidence was not credible and did not materially demonstrate that the prosecutor and Christopher had entered into an undisclosed plea deal in violation of Brady. The judge also explained why Christopher's testimony did not comprise impeachment evidence sufficient to grant a new trial. This consolidated appeal from the defendant's convictions and the orders denying both of the defendant's new trial motions followed.

a.  Decision not to hold an evidentiary hearing.  When considering a motion for a new trial, a judge "may rule on the motion 'on the basis of the facts alleged in the affidavits without further [evidentiary] hearing if no substantial issue is raised by the motion or affidavits.'"  Commonwealth v. Goodreau, 442 Mass. 341, 348 (2004), quoting Mass. R. Crim. P. 30 (c), 378 Mass. 900 (1979).  In determining whether a substantial issue exists, "a judge considers the seriousness of the issues raised and the adequacy of the defendant's showing on those issues" (citation omitted).  Barry, 481 Mass. at 401.  Clearly, the existence of an undisclosed plea agreement in violation of Brady would raise a serious issue.  See Goodreau, supra.

To demonstrate an adequately substantial issue to receive an evidentiary hearing, the defendant's submissions "need not prove the [motion's] factual premise . . . but they must contain sufficient credible information to cast doubt on the issue"

(quotations and citations omitted).  Goodreau, 442 Mass. at 348. When examining such evidentiary submissions, motion judges who also served as trial judges can use their "knowledge and evaluation of the evidence at trial" (citation omitted), Commonwealth v. Amaral, 482 Mass. 496, 509 (2019), to "consider whether holding a hearing will add anything" to the credibility or materiality of the affidavits submitted.  Goodreau, supra.

We review a judge's decision to deny a motion for a new trial without holding an evidentiary hearing "for a significant error of law or other abuse of discretion" (citation omitted). Commonwealth v. Bonnett, 482 Mass. 838, 843-844 (2019).  See Barry, 481 Mass. at 401.  This court extends "special [or substantial] deference" in situations such as this where the motion judge also conducted the trial, Commonwealth v. Grace, 397 Mass. 303, 307 (1986), and thus was in a "superior position to assess the credibility of the defendant's claims" of an undisclosed plea deal.  Commonwealth v. Freeman, 442 Mass. 779, 792 n.14 (2004).  Reversal for abuse of discretion in such circumstances "is particularly rare" (citation omitted). Commonwealth v. Rice, 441 Mass. 291, 302 (2004).  We will reverse the judgment only if the judge made "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable

alternatives" (quotations and citation omitted).  L.L. v.

Commonwealth, 470 Mass. 169, 185 n.27 (2014).

The judge here did not err in finding that the defendant's

evidence of a Brady violation, including the submitted

affidavits, Christopher's plea, and Christopher's civil action

testimony, did not create a substantial issue warranting an

evidentiary hearing because the evidence was not sufficiently

credible to "cast doubt on the issue" (quotations and citation

omitted).  Goodreau, 442 Mass. at 348.

i.  Lack of affidavits.  A judge may deny a motion for a

new trial without an evidentiary hearing where the moving party

"suspicious[ly] fail[s] to provide pertinent information from an

expected and available source."  Goodreau, supra at 354.

Defense counsel aiming to uncover a secret plea agreement

should, at a minimum, attempt to obtain information from the key

witness's attorney and the prosecutor who supposedly negotiated

the deal.  See Commonwealth v. Hill, 432 Mass. 704, 710-711 &

n.15 (2000).  Even if those parties refuse to provide

affidavits, as the defendant here assumed they would, defense

counsel could provide evidence of a possible Brady violation by

filing an affidavit presenting the parties' refusal to attest to

the lack of a negotiation or plea deal.  See Commonwealth v.

Raymond, 450 Mass. 729, 734 (2008) ("the absence of

countervailing affidavits from those in a position to know the

truth regarding the existence of an agreement supports a determination of a lack of credibility").  Here, defendant did neither and the silence betrays a "very telling omission" confirming the judge's finding that the defendant's motion did not raise a substantial issue about the existence of an undisclosed plea agreement.  Goodreau, supra.  See Commonwealth v. DeCicco, 51 Mass. App. Ct. 159, 163 (2001) (lack of affidavits as to plea agreement "handicapped" court).

ii.  Plea agreement.  Christopher's guilty plea also does not raise a substantial issue requiring an evidentiary hearing. Even though a favorable disposition for a cooperating witness following testimony can, when combined with other strong evidence, raise a substantial issue to cast doubt on a jury's conclusion, that situation does not present here.  See Hill, 432 Mass. at 710-711.

In his second motion for a new trial, the defendant attempted to explain how the facts in his case align with those in Hill, 432 Mass. at 716, where we held that the key witness's later plea provided grounds for a new trial.  As the judge here properly determined, the defendant's arguments are unavailing. In Hill, we affirmed an order for a new trial because the key witness received a plea deal that reduced his possible sentence by at least twelve and one-half years from the sentence that he would have received under his original indictment, in part

because during his testimony at the defendant's trial, the witness admitted to conduct that should have carried a significantly higher penalty, thus supporting an inference that the witness had an expectation of "substantial consideration." See id. at 711-712.  Although Christopher also received a more favorable sentence than what one would have expected based on his original indictment for murder in the first degree, he distanced, rather than inculpated, himself from his murder charge during his testimony at the defendant's trial.

Second, the defendant ignores that in Hill, 432 Mass. at 711, we relied on representations made by the prosecutor and the key witness at trial that "reasonably could be interpreted . . . as a promise" that later came to fruition.  The judge here found the opposite.  He explicitly endorsed the "prosecutor's specific, credible, and repeated [on-the-record] denials" of an undisclosed plea agreement.  At a sidebar discussing the defendant's motion in limine, the judge asked the prosecutor whether there were "any promise, reward or inducement," to which the prosecutor responded, "No."[7]  The prosecutor then explained that, during Treefon's criminal trial, Christopher testified and defense counsel cross-examined him regarding any expectation of

---

[7] The judge asked again whether "anybody said to [Christopher], 'Kid, you are getting second [degree murder] for [your testimony]'" and the prosecutor responded with "No, not by the Commonwealth.  Not by me."

a plea deal, and that Christopher also told the grand jury that there was no deal or collusion.  Further, the judge noted that because he made "[non]cursory or general" inquiries to the prosecutor, which the prosecutor denied directly, there was "no reason to repeat what would be a nearly identical inquiry of the prosecutor in a separate evidentiary hearing on this motion."

Moreover, defense counsel admitted at trial that his only factual evidence was an attorney's affidavit, attesting to having overheard a conversation outside of Treefon's criminal trial, in which an assistant district attorney unrelated to Treefon's or the defendant's criminal trials stated that Christopher would receive a plea of murder in the second degree for his testimony at Treefon's trial.  Defense counsel then confessed that the motion relied in part on his "subjective understanding" that prosecutors in Barnstable County often violated Brady by withholding evidence of plea deals with cooperating witnesses.  Instead of providing concrete evidence to bolster his view, defense counsel posited that "[i]t strains credulity to think that Christopher . . . , who is charged with a first degree murder, testified in the last trial for the Commonwealth, is going to testify in this trial for the Commonwealth and has nothing -- nothing -- nothing unspoken, nothing tacit -- in other words, he's going to walk out of here after that trial thinking in his head that he could still get

prosecuted for first degree murder. That's rubbish. That's not true." As attractive as his rhetoric may be, it is not legally persuasive. Cf. Commonwealth v. Jackson, 428 Mass. 455, 458-459 (1998) (discussing defense counsel's persuasive, yet legally unsuccessful, arguments about cooperating witness testifying to "save his own neck" and to "do anything, absolutely anything to please the government and convict [the defendant] because he doesn't want the punishment"). Without any statements by the prosecutor, by Christopher, or by his plea counsel hinting at promises, the judge did not abuse his discretion by trusting the prosecutor's unequivocal denials over the defense counsel's subjectively based thesis.

Lastly, the defendant cherry-picked statements at Christopher's plea hearing in an endeavor to align the facts in his case with those in Hill, 432 Mass. at 708, where the prosecutor noted at a hearing on the key witness's plea deal that the Commonwealth had offered a lighter sentence as a "quid pro quo" for the witness's testimony. The prosecutor here admitted that Christopher received a plea deal in part because of his testimony against Treefon and the defendant at their criminal trials. Unlike in Hill though, the comments by the prosecutor and Christopher's counsel at the plea hearing weigh against the defendant's position, and the defendant's selectively quoted words and phrases from the plea hearing,

taken out of context and contrary to their intended meaning, are not convincing.[8]

In sum, the judge made no "clear error of judgment," L.L., 470 Mass. at 185 n.27, in deciding that none of the evidence concerning what Christopher or the prosecutor said at the defendant's trial or at Christopher's plea deal "raise[d] a substantial issue with respect to" the existence of an

---

[8] First, the defendant points out that the prosecutor noted "no discussions concerning a change of plea were ever openly discussed" (emphasis added).  As the motion judge noted, that statement has to be considered in the context of the prosecutor's statement that immediately preceded the "openly discussed" comment, that "there was never an offer made to [Christopher] or his attorney during the pendency" of Treefon's or the defendant's cases.  In this context, the word "openly" does not magically connote any hidden agreement, and we agree with the judge that it likely demonstrated that the prosecutors may have deliberated internally about offering a plea before the end of trial or that they never uttered anything concerning it until after the trial.  Next, the defendant highlights that Christopher's plea counsel called the prosecutor a "man of his word" following the Commonwealth's recommendation of the plea.  But, as determined by the motion judge, Christopher's plea counsel used that phrase in the course of explaining to the plea judge that the prosecutor had helped instigate Christopher's transfer to a new jail because he endured serious threats for cooperating with investigations.  Finally, the defendant incorrectly alleges that Christopher's plea counsel admitted that a "quid pro quo" existed.  Christopher's plea counsel, not the prosecutor, mentioned "quid pro quo" while asking the judge for a lower sentence than the Commonwealth had recommended based on Christopher's "self-advancement and for his cooperation with the Commonwealth."  Plea counsel was not explaining the underlying reason for the Commonwealth's recommendation for a sentence.  As the judge stated, if there was a quid pro quo, the Commonwealth would have been bound by the agreement.

undisclosed plea deal in violation of Brady.  Goodreau, 442 Mass. at 354.

iii.  Credibility of Christopher's testimony at the civil trial.  In the context of a motion for a new trial "based on recantation by a material witness," the motion judge "grave[ly] consider[s] . . . the credibility of the witness's new testimony" (citation omitted), Commonwealth v. Waters, 410 Mass. 224, 231 (1991), based on the judge's evaluation of the submitted evidence "in light of factors pertinent to credibility, including bias, self-interest, and delay," Commonwealth v. Torres, 469 Mass 398, 403 (2014).  The judge examined Christopher's civil action testimony in light of Christopher's earlier trial appearances and grand jury testimony.  See Commonwealth v. Santiago, 458 Mass. 405, 416 (2010).  Even though Christopher was the Commonwealth's key witness and therefore his testimony was "particularly vulnerable to even slight blows to its credibility," Commonwealth v. Collins, 386 Mass. 1, 10 (1982), the judge determined that Christopher's civil action testimony alleging the existence of a secret plea agreement did not raise a substantial issue sufficient for an evidentiary hearing because it was unreliable, self-serving, and unworthy of further examination.  See Torres, 469 Mass. at 403.  The judge concluded that Christopher provided his civil action testimony to protect his father, and by

extension his mother and sisters, from losing their half of the victim's $2 million estate in Irene's wrongful death suit. There was no abuse of discretion.

To sufficiently demonstrate that Treefon actually had no connection to or responsibility for the victim's death, Christopher needed to recant his earlier testimony incriminating Treefon. Christopher asserted that his father "deserve[d] to win." To that end, Christopher outright contradicted his earlier testimony regarding the plea deal, and used the alleged "secret," unwritten plea agreement to explain his previous testimony against Treefon as a strategy encouraged by his attorneys to avoid a life sentence. In addition, throughout his civil action testimony, Christopher conveniently forgot facts or conversations related to Treefon's involvement, while having little difficulty remembering most details about the murder not implicating his father, including that the defendant killed the victim. Although not stating that his previous testimony painting his father as the mastermind of the victim's death was false, Christopher repeatedly claimed not to remember the circumstances or facts behind that testimony or even to recall giving that testimony only when confronting statements about Treefon. "The judge could [therefore] rationally conclude that the factual predicate for [these claims] was not credible." Goodreau, 442 Mass. at 351.

b. <u>Denial of the second motion for a new trial based on newly discovered evidence of a</u> Brady <u>violation</u>. For the same reasons as stated <u>supra</u>, the judge did not abuse his discretion in finding that there was no undisclosed plea deal that would require granting the defendant's second motion for a new trial based on the existence of a <u>Brady</u> violation. See <u>Grace</u>, 397 Mass. at 305-306.[9]

Even if we were to assume that Christopher's civil action testimony were newly discovered and credible evidence, the defendant could only prevail on the second motion for a new trial if that newly discovered evidence would have been a "real factor" in the jury deliberations so as to "cast real doubt on the justice of the conviction."[10] <u>Grace</u>, 397 Mass. at 305. See

---

[9] Where the defendant does not meet the requisite burden to establish that the motion judge erred in denying his request for an evidentiary hearing for an alleged <u>Brady</u> violation, the defendant necessarily will not meet the requisite burden, using the same evidence, to establish that the motion judge erred (or abused his discretion) in denying the defendant's motion for a new trial based on newly discovered evidence of that alleged <u>Brady</u> violation. See <u>Goodreau</u>, 442 Mass. at 355. Although "[t]he inquiry into whether the defendant has satisfied the new trial standard is conceptually distinct from" the inquiry into whether the judge correctly decided not to hold an evidentiary hearing, the judge relies on "many of the same considerations" regarding the "trustworthiness" of the submitted evidence to determine if the newly discovered evidence meets the threshold for a new trial by "cast[ing] real doubt on the justice of the conviction." <u>Commonwealth</u> v. <u>Drayton</u>, 473 Mass. 23, 39 (2015), <u>S.C.</u>, 479 Mass. 479 (2018).

[10] Some of our cases have reviewed an appeal from the denial of a motion for a new trial based on newly discovered evidence

Bonnett, 482 Mass. at 844. Although Christopher's civil action testimony does not raise a substantial issue about the existence of a Brady violation, it may constitute impeachment evidence of the Commonwealth's key witness at the defendant's trial. Newly discovered evidence that impeaches a key witness's credibility usually does not warrant a new trial. Commonwealth v. Drayton, 479 Mass. 479, 490 (2018). However, we will grant a new trial where the evidence "seriously undermines the credibility of that [key] witness['s]" testimony upon which the Commonwealth's case almost solely relied (citation omitted), Commonwealth v. Cowels, 470 Mass. 607, 621 (2015), as measured against the "over-all strength or weakness of the prosecution's case," id. at 623. Determining "whether such evidence warrants a new trial is left to the sound discretion of the motion judge." See Commonwealth v. Jones, 432 Mass. 623, 633 (2000).

First, even if the jury had heard the additional evidence from the civil action, the judge did not abuse his discretion by

_____

consolidated with the direct appeal from a conviction of murder in the first degree under the Grace standard. See Commonwealth v. Drayton, 473 Mass. 23, 31 (2015). Others have determined whether the newly discovered evidence created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Chatman, 466 Mass. 327, 333 (2013), S.C., 473 Mass. 840 (2016). Still others have combined the standards. See Commonwealth v. Shuman, 445 Mass. 268, 276 (2005). Although we have applied the Grace standard after a thorough review of the record, the outcome would be the same if we reviewed for a substantial likelihood of a miscarriage of justice, or for both standards.

concluding that it did not cast real doubt on the jury's conviction given the remaining evidence submitted by the Commonwealth.  See Amaral, 482 Mass. at 511.

In addition to the testimony of Christopher's friend corroborating the defendant's participation in the murder scheme, the defendant admitted during his interrogation to being with Christopher on Cape Cod at around the time of the murder, without a plausible alternative reason for being there, and to purchasing the Ruger and the ammunition that killed the victim. As the judge noted, there was a "web of evidence" strongly supporting the defendant's guilt, including his hiding the murder weapon, the ballistics evidence, and the defendant's text message, indicating the defendant's expectation of an influx of cash from his brother-in-law on the day of the murder.  The judge did not abuse his discretion by concluding that such evidence was "strongly persuasive" and therefore that Christopher's civil action testimony would not have been a "real factor" in the jury's deliberations so as to cast real doubt on the jury's verdict (citation omitted).  Bonnett, 482 Mass. at 844.

The defendant's version of events, which strained credulity, bolstered the Commonwealth's affirmative evidence. The defendant claimed that Christopher swiped the gun from the trunk of the defendant's car and then shot the victim without

the defendant's knowledge, all while the defendant waited in his car in a random parking lot in Hyannis. The defendant kept the key to the gun case with his keys to the car, which, according to his responses during interrogation, he never let out of his sight on the night of September 29, 2009. The girlfriend found the case locked in her basement days later. For Christopher to have used the gun without the defendant's knowledge, Christopher would have had to open the trunk, pick the lock on the gun case, close the trunk, return from the murder, open the trunk, replace the gun, and relock the case without a key, all without the defendant noticing. The jury could reasonably have inferred that this, or any similar version of the night's events,[11] was not credible, particularly in the context of the entirety of the defendant's interrogation, which was marked by denials and contradictions.

Second, the jury also knew that defense counsel's primary trial strategy was to impeach Christopher's credibility,

---

[11] In one of the letters from jail to his ex-girlfriend, all entered as exhibits by the prosecution, the defendant told an alternative form of this story where the defendant (1) bought the gun; (2) drove to Christopher's house; (3) used the bathroom and Christopher somehow took the gun; (4) did not notice the gun missing while driving Christopher to the Cape to meet with an unknown individual; (5) stopped to use the bathroom when returning from the Cape, at which point Christopher put the gun back into his car's center console; (6) noticed the open gun case in his trunk when he returned to his ex-girlfriend's house; and (7) brought the gun inside. The story has flaws similar to those in the story he told to police.

accomplished by repeated assertions during cross-examination and in closing.  Specifically, defense counsel highlighted concerns about Christopher testifying due to an undisclosed plea deal and about Christopher's truthfulness.  In other words, "to the extent that [Christopher] had the sword of Damocles hanging over him in the form of a murder charge, and thus had incentive to please the prosecution in the hopes of establishing good will and securing leniency even absent any explicit agreement, this was argued by defense counsel at trial," Jackson, 428 Mass. at 458, and considered by the jury.[12]  The judge therefore did not err in finding that admitting this testimony at trial would not have materially affected the jury's deliberations so as to cast real doubt on the conviction.

---

[12] Defense counsel noted during cross-examination that the Commonwealth had charged Christopher with murder in the first degree and asked if he would "be surprised" if he found himself "in this room three or four months" later.  He also asked whether Christopher thought that he was "going to get something for testifying here" and insinuated that Christopher did not really testify to do the right thing.  In closing, defense counsel first impeached Christopher's ability to tell the truth by reminding the jury that Christopher initially told one of his friends that he was responsible for the murder.  Defense counsel later suggested that the jury was "being asked to swallow a legal fiction on the question of whether or not Christopher . . . is getting anything for testifying."  He also informed the jury that promises could be as simple as a "nudge" or a "nod." Defense counsel finished by trying to convince the jurors that they should not believe Christopher's testimony because he only went to the police months after his arrest with "an expectation in his head of what he is getting for coming up here."

3. Review under G. L. c. 278, § 33E. As part of our plenary review, we note that, on direct examination, Christopher testified in response to the prosecutor's question, "What happened next?" as follows:

> [The defendant] -- he got in the car. And he said -- he said something like -- his hand was shaking; and he said something about he's not nervous. He said, 'I'm not nervous.' He said, 'I've done this before.'"

The defendant did not object to this statement at trial, in either of his motions for a new trial, or as a part of his direct appeal to us pursuant to G. L. c. 278, § 33E. Presumably, this reference to "I've done this before" went unnoticed by the parties and the court.

The prosecution "may not introduce evidence that a defendant previously has misbehaved . . . for the purposes of showing his bad character or propensity to commit the crime charged" (citation omitted). Commonwealth v. Morgan, 460 Mass. 277, 289 (2011). See Mass. G. Evid. § 404 (b) (2019). However, the prosecution may introduce that same evidence for other valid reasons, so long as its probative value is not outweighed by the danger of unfair prejudice. Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). Judges "must guard against the risk that such evidence will divert the jury's attention from the charged crime or otherwise unfairly prejudice the defendant." Commonwealth v. Facella, 478 Mass. 393, 407 (2017). In the absence of a

limiting instruction to the jury regarding the introduction of prior bad acts where the defendant did not object, we review the error for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Sullivan, 436 Mass. 799, 809 (2002).  On the record before us, where the evidence was not specific as to what the defendant had done before, and where the prosecutor did not mention the fact in his closing, we find that the error created no substantial likelihood of a miscarriage of justice.

We therefore conclude that the verdict of murder in the first degree is consonant with justice, and we decline to exercise our authority under G. L. c. 278, § 33E to order a new trial or to reduce the verdict.

Conclusion.  For the reasons stated, we affirm the defendant's convictions and the orders of the Superior Court denying the defendant's motions for a new trial.

So ordered.